# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE**

| | | |
|---|---|---|
| **JAMESENA MCDERMOTT MILLER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:03-CV-269** |
| **v.** | ) | **Phillips/Shirley** |
| | ) | |
| **THE UNIVERSITY OF TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>AFFIDAVIT OF PHILIP A. SCHEURER</u>**

COUNTY OF KNOX )
)
STATE OF TENNESSEE )

Philip A. Scheurer, being duly sworn, deposes and says:

1. I am Philip A. Scheurer.

2. I am making this Affidavit on the basis of information personally known to me.

3. Until my retirement on June 30, 2005, I was employed by the University of Tennessee. During the times mentioned in this Affidavit my position was either Vice Chancellor for Administration and Student Affairs or Vice President of Operations at the University of Tennessee.

4. In my position I had several responsibilities, including that of the campus food services program for the Knoxville campus of the University.

5. Until July 1, 1997, the University managed and operated the campus food service program for the Knoxville campus through its own employees.

6. In 1996, the University decided to seek bids from third-party contractors to manage

and operate the University's campus food service program for the Knoxville campus.

7. Aramark Educational Services, Inc. ("Aramark") was the successful bidder for the outsourcing. The University entered into a Food Services Management Contract with Aramark ("Contract"), which became effective July 1, 1997. A copy of the Contract is attached as Exhibit 1. Under the Contract, Aramark was to manage and operate the Knoxville campus food service program.

8. Pursuant to the Contract, the employees of the University who were working on the campus food service program could elect to sever their employment with the University and become employees of Aramark or continue on as University employees under Aramark management. One of the benefits that Aramark offered was that to the extent any University employee chose to become an employee of Aramark, they would receive full benefits. Prior to that, many University employees in the program were not receiving benefits as they were part-time or term employees.

9. For several years prior to 1997, Plaintiff was employed by the University in the campus food service program. In 1996, the Director of Food Services, Norman Hill, retired. I appointed Plaintiff Acting Director of Food Services effective December 15, 1996.

10. As Acting Director of Food Services, Plaintiff had certain management responsibilities for the food service program on the Knoxville campus. In addition, Plaintiff had certain responsibilities with regard to the VolCard program and the vending machine program.

11. Once the Contract became effective, the responsibilities which had been carried out by Plaintiff as Acting Director of Food Services became the contractual responsibilities of Aramark under the Contract.

12. Pursuant to the Contract, the University could name a contract administrator as a

liaison between the University and Aramark. I decided to give these responsibilities to Plaintiff once the Contract went into effect. On June 6, 1997, after so advising Plaintiff, I notified Aramark that, effective July 1, Plaintiff would act as contract administrator. This decision was evidenced by letter dated June 6, 1997, Exhibit 2.

13. Certain job responsibilities of the contract administrator were defined in the Contract. Because there had not previously been a contract administrator (inasmuch as the University had been administering the food service program), I explained to Plaintiff that we would endeavor to define the job description as we gained experience. I explained to Plaintiff that the contract administrator was a liaison position between the University and Aramark. The assignment was not a promotion, but simply an assignment of duties necessitated by the execution of the Contract. I advised Plaintiff that her responsibilities would not be to manage the food services program. That would be the contractual responsibility of Aramark.

14. It was of critical importance to the University that the transition of the food service program from the University to Aramark be successful. As of that time, the food service program was the largest University program the University had outsourced to a third-party contractor. The amount the University received from Aramark during the first year of the Contract was to be a minimum of $1.5 million. During the last year the University managed the food services program the comparable amount the University received was approximately $300,000.00. In addition, Aramark agreed to expend $2.5 million for food services facility renovations.

15. Once the Contract went into effect, I received numerous complaints, sometimes daily, from Aramark officials regarding Plaintiff's actions. Aramark executives complained that Plaintiff was continuously trying to participate in the management decisions which had been contractually

delegated to Aramark, including such decisions as food preparation and when food services would be available. Aramark officials complained to me that Plaintiff was obstructing changes Aramark wished to make in the program and was meddling in day-to-day food operations and activities. In general, Aramark executives complained that Plaintiff was an impediment to the smooth operation and transition of the Contract.

16. Many of the complaints raised by Aramark about Plaintiff's action were reported back to Plaintiff by my office, with proposed corrective action. In many instances, Plaintiff did not change her behavior or actions. Because of the necessity of making the transition successful and because of the numerous complaints I had received about Plaintiff, on June 3, 1998, after the Contract had been in effect approximately one year, I decided to remove the responsibilities of contract administrator from Plaintiff. The University did not hire a new employee to handle these responsibilities. I simply assigned those duties to a long-term employee of the University, Jeff Maples. I did not hire a new employee to assume Plaintiff's duties. I did not relieve Plaintiff of these responsibilities out of any bias against her because of her gender, age, or race. I did so simply to facilitate the transition of the food services program from the University to Aramark and because of the numerous complaints Aramark had registered about Plaintiff.

17. Following June 3, 1998, Plaintiff retained her job title of Acting Director of Food Services. Her salary remained the same. Plaintiff retained her other job responsibilities, that is the VolCard and vending machine programs.

18. I also informed Plaintiff in June of 1998 that she should search for other opportunities within the University and I volunteered to assist her in this regard. I told her that, if after six months, she decided to remain in her current position, I would request the Department of Human Resources perform a job audit in regard to her position responsibilities. Thereafter, Human Resources would

provide a recommendation to me as to her appropriate salary and title.

19. That six month timeline was extended. On January 25, 1999, Plaintiff sent a letter to the University stating that she intended to retire effective April 30, 1999 (Exhibit 3). Therefore, Plaintiff continued with the same title and salary until her final retirement date, June 30, 1999.

20. I understand Plaintiff is complaining about my actions following a meeting of the University of Tennessee Black Faculty & Staff Association. I did not attend the meeting Plaintiff refers to in her Complaint (which she says occurred in May, 1997). Following the meeting, however, I did receive a report from the Executive Director of Human Resources that Plaintiff had stated at the meeting that the University, in outsourcing its food service program, was discriminatory as it adversely affected many employees who were Black.

20. When these remarks were reported to me, I was concerned because the comments were untrue and, further, because the comments could undermine the relationship between the University and its employees. Shortly thereafter I asked Plaintiff to attend a meeting and explain whether she had made such comments or not. Plaintiff denied that she had made any such comments, and I took no further action, disciplinary or otherwise, concerning Plaintiff.

21. I also understand that Plaintiff is complaining that her office was relocated from the Student Services Building to Neyland Stadium.

22. Historically, when the University was managing the food service program, the office of the Director was located in the Student Services Building. When Aramark assumed the management of the food services program, its offices were located in the Presidential complex at the request of Aramark. Because of that, there was no reason for the contract administrator's office to stay in the Student Services Building. Since Plaintiff also had responsibilities over the VolCard

program, which was located in Neyland Stadium, I made the decision to move Plaintiff's office from the Student Services Building to Neyland Stadium in immediate proximity to the functions she was overseeing. This was accomplished in 1997.

25. Elsewhere in her Complaint, Plaintiff complains about the actions of Dan Sokolovic and Scott Ownby. These two individuals were not employees of the University, but were employees of Aramark. At no time after Aramark was awarded the Contract, did Plaintiff report to me that either Mr. Sokolovic or Mr. Ownby make any statements or comments to her that she believed were based on any ageist, gender-based, or race-based animus towards her.

25. Further, deponent sayeth not.

Philip A. Scheurer

Sworn to and subscribed before me
this 30 day of August, 2005.

Notary Public

My Commission expires: 04-01-06

# FOOD SERVICES MANAGEMENT CONTRACT

**THIS CONTRACT,** made this 4th day of June, 1997, by and between **THE UNIVERSITY OF TENNESSEE** ("Client") and **ARAMARK EDUCATIONAL SERVICES, INC.,** a Delaware corporation, having its principal place of business at ARAMARK Tower, 1101 Market Street, Philadelphia, Pennsylvania ("ARAMARK").

**WITNESSETH THAT:**

1. **ENGAGEMENT OF ARAMARK; EFFECTIVE DATE:** Client hereby engages ARAMARK to provide Client with meals, including a la carte items and non-alcoholic beverages, for its students, faculty, staff and guests and on an exclusvie basis for meal board plan options on its campus in Knoxville, Tennessee. The effective date of this Agreement is July 1, 1997.

2. **DEFINITIONS:** The following words and phrases when used in this Contract, or any amendment hereto, shall have the meanings given to them in this Paragraph:

A. **"Accounting Periods":** The two (2) Accounting Periods of four (4) weeks each and one (1) Accounting Period of five (5) weeks which occur in each quarter. The September Accounting Period in 1997 shall consist of six (6) weeks.

B. **"Agreement":** The Agreement shall be comprised of the Request For Proposal ("RFP"), dated December 2, 1996, issued by Client, ARAMARK's Proposal, dated February 17, 1997 (the "Proposal") and this Food Services Management Contract. In the event of a conflict between this Food Services Management Contract, the RFP or ARAMARK's Proposal, the terms of this Food Services Management Contract shall govern. In the event of a conflict between the RFP and ARAMARK's Proposal, the terms of the Client's RFP shall govern.

C. **"Campus Food Service Program":** Those board, cash, catering and other related food service operations as defined in Client's RFP are to be provided by

ARAMARK under this Agreement. In addition, the Athletics Association (Varsity Inn only) is included as part of the Campus Food Service Program as defined under this Agreement.

D. **"Net Receipts":** Receipts received by ARAMARK from ARAMARK's gross sales less applicable state and local sales taxes.

E. **"Food Service Facilities":** The areas, improvements, personal property and facilities made available by Client to ARAMARK for the provision of the food services as identified in Section 2.1-A of the RFP.

F. **"Prime Interest Rate":** The interest rate published in The Wall Street Journal as the base rate on corporate loans posted by at least Seventy-Five Percent (75%) of the thirty (30) largest U.S. banks, such rate to be adjusted on the last day of each Accounting Period. This rate may not increase more than 1% per annum.

G. **"Servicewares":** Items used in the serving of food and beverages such as chinaware, glassware and silverware.

H. **"Small Expendable Equipment":** Items used in the preparation of food such as pots, pans and kitchen utensils.

I. **"Term":** The term of this Agreement shall commence on the effective date hereof and shall continue for a period of five years thereafter, and may be extended by mutual agreement of the parties for five additional periods of one year each.

3. **FACILITIES AND EQUIPMENT:**

A. **Food Service Facilities:** Client shall make available on the effective date of the agreement to ARAMARK the Food Service Facilities, completely equipped and ready to operate, together with such heat, refrigeration, and utilities service as may be reasonably required for the efficient performance of this Agreement. Client shall have full access to the Food Service Facilities at all times.

B. **Repair, Replacement and Maintenance:** Client shall furnish building maintenance services for the Food Service Facilities. All costs for such maintenance services (preventative and emergency) and equipment repairs of equipment utilized by ARAMARK in the Food Service Facilities shall be borne by ARAMARK. ARAMARK is

responsible for maintaining plumbing and electrical connections to support the operation of all equipment, and the Client will be responsible for plumbing and wiring from within the wall or floor. All costs for rewiring, plumbing, and data connections associated with the relocations, replacement, or removal of any equipment will be borne by ARAMARK.

ARAMARK will be responsible for replacement of Client-owned equipment where negligence of ARAMARK is indicated. ARAMARK shall be responsible for the cleaning and unclogging of sewer lines and grease traps and any associated expenses. ARAMARK will be responsible for all costs associated with cleaning and servicing of exhaust hoods and fan ventilation systems for kitchens. ARAMARK will replace tubes and bulbs in electrical fixtures in all food units and will maintain and repair restroom facilities located inside food service facilities to include unclogging stopped up sewer lines and sinks.

C. **Servicewares and Small Expendable Equipment:** Client shall furnish an initial inventory of Servicewares and Small Expendable Equipment. At the commencement of operations hereunder, ARAMARK and Client shall jointly take an opening inventory of such Servicewares and Small Expendable Equipment, a copy of which shall become part of this Agreement. ARAMARK shall maintain such inventory at its expense. ARAMARK will agree to purchase at cost the opening inventory of such disposable serviceware belonging to Client.

D. **Capital Outlay:** ARAMARK agrees to expend $2,500,000 (the "Expenditure") for food service facility renovations to be used on Client's premises at a time schedule to be mutually agreed upon by ARAMARK and Client. An itemized list of such renovations, including the total cost thereof, shall be attached to this Contract as Exhibit "A" and incorporated herein by reference. The Client reserves the right to review and approve all costs pertaining to capital outlay prior to the commencement of said renovations. ARAMARK shall amortize the Expenditure on a straight line basis over a period of seven years from the date contract is executed.

Upon expiration or termination of this Agreement by either party prior to the complete amortization of the Expenditure, Client shall reimburse ARAMARK, or cause a successor contractor to ARAMARK to reimburse ARAMARK, within 30 days of expiration or termination for the unamortized balance of the Expenditure as of the date of expiration or termination.

Title to the equipment shall pass to Client upon completion of amortization or earlier payment to ARAMARK of the unamortized balance. At that time, ARAMARK will convey the equipment to Client by a bill of sale.

4. **CLEANING RESPONSIBILITIES:** ARAMARK shall maintain high standards of sanitation and shall be responsible for routine cleaning and housekeeping in the food preparation and service areas (including food service equipment, kitchen floors, hoods and grease filters) and for the routine cleaning of cafeteria tables and chairs. ARAMARK shall provide regular cleaning service for cafeteria walls, windows, floors, light fixtures, draperies and blinds, and periodic waxing and buffing of floors. In addition, ARAMARK shall be responsible for routine cleaning of all grease traps, duct work, plenum chambers and roof fans. ARAMARK shall be responsible for trash and garbage removal, servicing of fire extinguishing system for kitchen hoods, and extermination service in accordance with Client's contracts for these services.

5. **FOOD SERVICE AND MENUS:** ARAMARK shall manage the Campus Food Service Program for Client and Client's students, faculty, staff and guests at such hours and locations as Client and ARAMARK mutually determine. ARAMARK shall submit menus with estimated cost per meal to such person as Client shall designate at least one (1) week in advance of implementation.

6. **PRICES:** Client and ARAMARK shall mutually determine the a la carte prices at which items shall be sold. If ARAMARK sustains increases in its operating costs, ARAMARK may, with written notification and appropriate documentation to Client, increase its prices to recover such increased costs. ARAMARK shall have the right to implement such price increases upon approval by Client.

7. PERSONNEL:

A. ARAMARK shall provide and pay a staff on duty on Client's premises for the efficient management of the Campus Food Service Program. All regular employees on Client's payroll at the time contract is awarded will be given the option to remain with the University or be employed by ARAMARK. ARAMARK will have the right and responsibility to control and direct the services of these employees, not only as to the result to be accomplished, but also as to the means by which the result is to be accomplished. Employees of ARAMARK will be subject to the rules and regulations of Client while on Client's premises.

B. ARAMARK shall assign to duty on Client's premises only employees acceptable to Client.

C. On or before the Effective Date of this Agreement, **or any date thereafter agreed to by both parties,** employees of Client employed in the Campus Food Service Program ("Client Employees") may elect to sever such employee's employment relationship with Client and become employees of ARAMARK. Client Employees that make such election shall hereinafter be referred to as "Transition Employees". A Transition Employee shall be paid by ARAMARK at the wage rate that such Transition Employee was paid as a Client employee immediately prior to becoming an ARAMARK employee. In addition, the Transition Employees shall be entitled to ARAMARK's standard fringe benefit package. ARAMARK will not be required to retain Transition Employees who do not meet ARAMARK's standards. **Regular employees who elect to continue as Client Employees will be allowed to do so and will be paid by the Client. ARAMARK will be billed for actual costs for such employees, which includes salaries plus fringe benefits. The fringe benefit for fiscal year 1997-98 will be 28% of employee's gross salary. The fringe benefit rate is subject to review on the annual renewal date of each year of the contract.**

With respect to such Transition Employees, ARAMARK shall not assume or otherwise be responsible for (i) any employee benefit plans, whether formal or informal, whether or not set forth in writing, and whether covering one person or

more than one person, sponsored or maintained by Client prior to the Effective Date hereof, or (ii) any and all claims, damages, liabilities, costs or expenses (including reasonable legal fees), known or unknown, against Client (whether under federal, state or local law or regulation, under any employment agreement, or otherwise) asserted by any Transition Employee arising or accruing prior to the Effective Date hereof on account of or for (a) wages or salaries, (b) overtime pay, (c) any amount of vacation pay or pay in lieu thereof accrued or earned, (d) workers' compensation benefits or disability benefits, (e) severance benefits, (f) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours of work, (g) any violation of the Worker Adjustment Retraining Notification Act, and (h) any written or oral collective bargaining or other contracts or commitments, pension plans, employee benefit plans, statute, ordinance or regulation relating to unfair labor practices, human rights, occupational safety in employment or employment practices. For the purposes hereof, the term "employee benefit plan" includes all plans, funds, programs, policies, arrangements, practices, customs and understandings providing benefits of economic value to any Transition Employee. Regular employees electing to continue as Client Employees will continue to receive all fringe and other benefits applicable to Client's regular employees subject to the Policy and Procedures set forth in the Client's Personnel Policy and Procedure Manual and future salary guidelines.

Involuntary demotions and change in job duties and assignments that compromise the integrity of the Client's employees position must be approved in advance in writing by the Client's designated representative and may not result in a pay decrease unless unacceptable performance has been documented by ARAMARK and their documentation approved in writing by the Client's Director of Human Resource Management.

Seasonal employment may result in layoffs. In these situations, employees will be laid off in the following order: students, temporary employees, ARAMARK employees, and Client's regular employees. The Client's reduction in force

and restoration in force policies will be applied to situations involving the layoff of Client's employees.

ARAMARK will provide operational supervision, periodic evaluations, and discipline of Client's employees pursuant to the Client's Personnel Policies and Procedures. All grievances will be initially handled by ARAMARK's onsite staff and if not resolved to the satisfaction of both the employee and ARAMARK will then continue within the Client's regular Personnel Procedures.

All terminations of Client's employees must be approved in writing by the Client's Director of Human Resource Management prior to notifying the employee of the termination.

As these positions become vacant through normal attrition, ARAMARK will replace as needed with ARAMARK employees according to ARAMARK Personnel Policy.

D. Within twenty (20) days after the end of each Accounting Period, Client shall submit to ARAMARK an invoice for the wages and salaries of Client Employees, which will include annual, sick or personal leave paid, together with a charge for actual fringe benefits incurred not to exceed a rate of twenty-eight percent (28%) (the "Fringe Benefit Charge") of such Client Employees wages and salaries. The Fringe Benefit Charge shall include all payroll taxes, workers' compensation costs, unemployment taxes, medical benefits and similar state or local benefits customarily or legally obligated to be provided to Client Employees. Any increases by Client in the wages and salaries of Client Employees or the Fringe Benefit Charge shall be requested as an increase during the budget cycle for the following fiscal year.

E. ARAMARK will employ Client's students as employees to the fullest extent possible when employing part-time staff. Student employees currently participating in the Client's "workship" program and in good standing will be allowed to continue. New students having applied and been approved for "workship" for academic year 1997-98 will be considered in hiring for vacant student positions. ARAMARK will provide the tuition

prepayment to Client for these students' prearranged commitment for either a 9 hours/week workship, paying $550.00/semester, or 13 hours/week workship, paying $850.00/ semester. Workship funding will be applied to student fees and reflected on the CSA VolXpress statement with ARAMARK providing a third party guarantee to Client for that portion of student fees covered by the workship agreement by advance check from ARAMARK to Client. ARAMARK will arrange payroll deduction for repayment of workship through their in-house payroll system. Continuation of the ARAMARK workship program may be re-evaluated on an annual basis, and it will be ARAMARK's sole decision to provide this program for future years beyond 1997-98.

**F.** If ARAMARK incurs any retroactive wages and other damages, as a result of any personnel action taken by Client or by ARAMARK at the direction of Client, which action ARAMARK would not have taken but for Client's direction, Client shall reimburse ARAMARK for such costs.

**G.** Client acknowledges that ARAMARK has invested considerable amounts of time and money in training its supervisory employees in the systems, procedures, methods, forms, reports, formulas, computer programs, recipes, menus, plans, techniques and other valuable information which is proprietary and unique to ARAMARK's manner of conducting its business and that such information is available, on a confidential basis, to ARAMARK's supervisory employees. Therefore, Client agrees that supervisory employees of ARAMARK will neither be hired by Client for the term of this Agreement and six (6) months thereafter, nor will Client permit supervisory employees of ARAMARK to be employed in Client's dining services for a period of six (6) months subsequent to the termination of this Agreement (unless such employees were formerly employees of Client). For the purpose of this prohibition, "supervisory employees" shall be defined as those persons who have directly or indirectly performed management or professional services on Client's premises at any time during the twelve (12) month period immediately preceding termination of this Agreement.

In addition, Client agrees that if it violates the conditions set forth in the immediately preceding paragraph, then Client shall pay to ARAMARK and ARAMARK shall accept as liquidated damages and not as a penalty for such breach, an amount equal to two times the annual salary of the ARAMARK supervisory employee hired by Client or allowed to work on Client's premises in violation of the terms of this Agreement.

**H.** ARAMARK shall not discriminate because of race, color, religion, sex, age, national origin, disability, or status as a Vietnam Veteran, as defined and prohibited by applicable law, in the recruitment, selection, training, utilization, promotion, termination or other employment-related activities concerning employees of the Campus Food Service Program. ARAMARK affirms that it is an equal opportunity and affirmative action employer and shall comply with all applicable federal, state and local laws and regulations.

**8. HEALTH EXAMINATIONS:** ARAMARK shall cause all of its employees assigned to duty on Client's premises to submit to periodic health examinations as required by law, and shall submit satisfactory evidence of compliance with all health regulations to Client upon request.

**9. PURCHASING:** ARAMARK shall purchase and pay for all food, supplies and services utilized in the Campus Food Service Program.

**10. INVENTORY OF FOOD AND SUPPLIES:** At the commencement of operations hereunder, Client and ARAMARK shall jointly conduct an inventory of Client's food and supplies, a copy of which shall become a part of this Agreement. ARAMARK will agree to purchase at cost the closing inventory of such food and supplies belonging to Client. ARAMARK shall maintain such food and supplies inventory at their expense.

At the termination of this Agreement, Client may, if requested by ARAMARK, either purchase directly or cause ARAMARK's successor to purchase ARAMARK's usable inventory of food and supplies.

**11. LICENSES, PERMITS AND TAXES:** ARAMARK shall obtain all federal, state and local licenses and permits required to operate the Campus Food Service Program and

shall be responsible for payment of all applicable sales, use, excise, state and local business and income taxes attributable to the Campus Food Service Program.

**12. INSURANCE AND INDEMNIFICATION:**

A. ARAMARK shall provide the University with satisfactory evidence of the following insurance coverage:

| | | Coverage | Limit |
|---|---|---|---|
| (1) | | Workers Compensation: | |
| | | Applicable Federal and State | Statutory |
| | | Employer's Liability | $500,000.00 |
| (2) | | Comprehensive General Liability, including Products and Completed Operations, Broad Form Property Damage Liability, Contractual, Personal Injury and XCU Coverage (if applicable) | |
| | (a) | Bodily Injury Limits of: | $1,000,000.00 |
| | | Annual Aggregate of: | $2,000,000.00 |
| | (b) | Property Damage Limits of: | $1,000,000.00 |
| | | Annual Aggregate of: | $2,000,000.00 |
| | OR | Combined Single Limits Equal to: | $2,000,000.00 |
| | | | $4,000,000.00 |
| (3) | | Automobile Liability to Include Owned, Non-owned, and Hired; Bodily Injury and Property Damage Combined Single Limits equal to:; | $500,000.00 |

Such insurance shall be written by insurer(s) acceptable to the Client. The certificate of insurance shall indicate whether the policy or policies of insurance are

written on a claims-made or occurrence basis. The coverages provided under the General Liability Insurance, or Comprehensive General Liability Insurance specified above, shall name the Client as an additional insured to the extent of the work or for services performed under this agreement by ARAMARK. Evidence of compliance shall be in the form of an original endorsement issued by the insurer(s) and appended to the aforementioned required certificate of insurance.

    **B.**  ARAMARK shall indemnify, defend and hold harmless Client and the Client's officers, authorized agents and employees against and from all claims or demands by or on behalf of any person, firm, corporation or governmental authority, arising out of, attributable to or in connection with the use, occupation, possession, conduct or management of the Food Service Facilities, including all claims for injury or death to persons or damage to property attributable to the negligence of ARAMARK. ARAMARK also covenants and agrees, at its sole cost and expense, to hold harmless Client and the Client's officers, authorized agents and employees from and against all judgments, costs, reasonable counsel fees, expenses and liabilities incurred in connection with any such claim and any action or proceeding brought thereon, and in case any action is brought against Client or against any of Client's officers, authorized agents and employees, by reason of any such claim, ARAMARK upon notice from Client will resist and defend such action or proceeding by qualified counsel, but only in connection with ARAMARK's negligence. The University retains the right to approve of any handling of a claim or legal action by ARAMARK naming The University of Tennessee, the State of Tennessee or their employees. Client agrees to promptly notify ARAMARK of any claims for which it seeks indemnity under this Agreement and to cooperate with ARAMARK in the investigation, defense, and settlement of all such claims.

13. FINANCIAL TERMS:

A. **Client's Responsibilities:** All facilities and equipment at the date of this agreement to be provided by Client under this Agreement shall be at Client's expense except as otherwise stipulated.

B. **Client's Commission:** ARAMARK shall retain all cash and charge receipts from the Campus Food Service Program. ARAMARK shall return to Client a commission of Eleven Percent (11%) of Net Receipts, excluding University Club sales. ARAMARK shall return to Client a guaranteed minimum commission of $1,500,000, annually.

C. **Board Plan Rates:**

| | |
|---|---|
| 7-Star/100 Meal Plan | $938.00 per semester |
| 10-Star/300 Meal Plan | $901.00 per semester |

Prior to the beginning of each semester, Client shall furnish ARAMARK with information of students entitled to meals at Board Plan Rates and activate their accounts in accordance with Client's Policies. Changes to accounts will be updated, electronically and be available in real time to ARAMARK via the VolXpress Campus Wide Access System. ARAMARK will have access to review the on-line changes to the initial participant list. The amount due ARAMARK is based on the initial Board Plan Assessment for the academic term less the bad debt expense, currently one-half of one per cent. This initial Board Plan Assessment will fluctuate as students add the meal plan or withdraw from school. The client will remit the net board plan income which is the board plan assessment adjusted for (1) meal plan drops and adds, (2) bad debt expense, and (3) Client's 11% commission in three installments. The Client will remit 1/3 of the net board plan income 4 weeks into the term, 1/3 of the net board plan 10 weeks into the term, and the remaining balance at the end of the term. No allowance will be made for meals or days which Contract patrons miss, and partial days will be considered full days. Meals are to be provided for all Holidays and Break periods as spelled out in the Terms and Conditions of the Room and Board Contract signed annually by the student.

Refunds for student releases and withdrawals from the University are also to be made according to the Terms and Conditions of the Room and Board Contract.

Board Plan Contract Releases will be processed by the Client after approval of ARAMARK. Increases or additions to Board Plans will be processed by the Client at the request of the student who will be billed via VolXpress on the next CSA billing period.

Students participating in either Board Plan option may select meals using the meal equivalency at the designated food facilities where meal plan meal equivalencies were honored during 1996-97.

Acceptance of meal equivalencies at branded concepts opened at a later date will be negotiated. ARAMARK will operate the Presidential Dining Hall, Morrill Dining Hall, and Strong Dining Hall as traditional meal plan operations and will allow free flow between these operations and unlimited entry (to students on 7 Star/100 meal plan) basis. Guest meal rates for these facilities are:

| | |
|---|---|
| Breakfast | $4.25 + tax = $4.60 |
| Lunch | $5.17 + tax = $5.60 |
| Dinner | $6.87 + tax = $7.44 |

ARAMARK will honor the All Star Debit Accounts in all Dining Service units and will receive payment for net receipts from these transactions less 11% commission within 30 days after the end of each accounting period.

ARAMARK will provide, at no charge to Client, a combination Debit/Meal Card to Client's Contract Administrator to be used for purpose of monitoring quality of service and product of the Food Service facilities.

D.    **Catering:** ARAMARK shall provide catering services upon request for special groups and Presidential functions authorized by Client at prices to be mutually agreed upon.

E. **University Club:** ARAMARK will operate the University Club on a management fee basis. Terms and conditions are to be determined by joint agreement between Client and ARAMARK.

F. **Utilities Expense:** Client shall be responsible for providing access to electricity, gas, steam, coal, water, sewer service, and air conditioning, where applicable (collectively, the "Utilities"), for the Campus Food Service Program. Where Utilities are metered solely for ARAMARK's operations, the costs of such metered Utilities shall be paid monthly by ARAMARK to Client. In those units without metering, a square footage charge will be assessed based upon the costs of metered units per square foot, or other such documented volume usage for a similar area or operation, and paid monthly by ARAMARK to Client. In no event shall the Utilities expense paid by ARAMARK exceed $412,000 (the "Utilities Expense Cap") in the first year of this Agreement. Thereafter, the Utilities Expense Cap will be adjusted by percentage rate charges passed along to the Client by utilities suppliers.

G. **ARAMARK's Conditions of Proposal:** ARAMARK listed exceptions to the Client's RFP and outlined these items under 6.3 of the Executive Summary, labeled as Conditions of Proposals. The Client accepts the following conditions as outlined in the proposal:

(1) ARAMARK takes exception to any transaction fee or percentage levied on cash, declining balance or meal plan transactions.

(2) ARAMARK shall pay a 28% charge on all University Dining Service employees' wages and salaries. This amount shall include all payroll taxes, workers' compensation, unemployment taxes, medical benefits and any other state benefits customarily and legally obligated to be provided to University employees.

(3) ARAMARK takes exception to any liquidated damage penalties for capital renovations delays. All capital outlay will be paid on a mutually agreed schedule; however, ARAMARK will not be held financially liable for renovation delays.

(4) ARAMARK takes exception to the quarterly facilities rental payments. Our commission return to the University includes these payments.

(5) ARAMARK takes exception to equipment rental charges. Our commission return to the University includes these payments.

(6) ARAMARK accepts the 3% discount on the All Star Plus debit card sales for the initial year of the contract only.

(7) ARAMARK will honor deposits made to the All Star Plus account on a dollar for dollar basis with no "bonus" dollar incentives for deposited amounts.

(8) ARAMARK understands that the cost of any University Contract Administrator assigned to supervise campus dining services is the sole cost of the University.

(9) ARAMARK's entire proposal, investment and financial return is made conditional on the retention of the current mandatory board program in its current form and locations and levels excepting any revisions that are mutually agreed upon.

(10) As evidenced by the letters included in our proposal, ARAMARK has obtained preliminary site approval for all the National Branded concepts contained herein. However, due to a lengthy approval process and the possibility of local franchisee objections, final site approval is not granted by any of the National Branded Concepts prior to the award of contract and a full site evaluation is completed. Our ability to deliver these concepts remains contingent on this final approval. ARAMARK is the manager of over 18 national branded licenses and franchises and has the capability of providing back up for national or signature brands for each of our proposed national branded concepts should it be necessary to do so.

(11) ARAMARK caps its total repair and maintenance costs billed through the client at $300,000 per year. The Client and ARAMARK shall negotiate mutually acceptable increases annually.

(12) ARAMARK will honor the current meal plan declining balance and equivalency program in the initial year. However, in year two ARAMARK may propose

modified board plans, but any changes proposed by ARAMARK must be approved in advance by Client.

(13) ARAMARK will honor the use of meal equivalency in the convenience store in the All American Grill area to the extent mutually agreed upon by the Client and ARAMARK.

(14) ARAMARK takes exception to the provision requiring ARAMARK to pay the cost of a Client audit whether or not deficiencies are found. ARAMARK will pay interest on any funds determined to be owed to the Client by such an audit.

**14. ACCOUNTING:**

A. **Commission Payment:** Within thirty (30) days after the end of each Accounting Period, ARAMARK will pay to Client the commissions due Client for all net receipts excluding board plan and All Star Debit accounts.

B. **Payment Terms:** All invoices submitted by ARAMARK to Client for amounts owing under this Agreement shall be paid within thirty (30) days of the date invoice is received.

C. **Interest:** In the event either party fails to pay an amount owed to the other pursuant to this Agreement by the date set forth herein, the party owing such overdue payment shall also pay interest at the rate of one and one-half percent (1-1/2%) per month beginning on the day after payment is due. Interest which is unpaid at the end of each month shall be added to the principal amount of the debt and shall thereafter accumulate interest.

**15. FORCE MAJEURE:** Neither party shall be responsible to the other for any losses resulting from the failure to perform any terms or provisions of this Agreement, except for payments of monies owed, if the party's failure to perform is attributable to war, riot, or other disorder; strike or other work stoppage; fire; flood; or any other act not within the control of the party whose performance is interfered with, and which, by reasonable diligence, such party is unable to prevent. Any such occurrence shall be referred to as a

"Force Majeure". In the event of a Force Majeure which interferes with the Campus Food Service Program, upon request, ARAMARK shall take all reasonable steps to continue to provide service upon terms and conditions satisfactory to ARAMARK and Client.

16. ACCURATE BOOKS AND RECORDS: ARAMARK shall maintain accurate books and records in connection with the Campus Food Service Program and shall retain such records for a period of four (4) years beyond the current contract year.

ARAMARK agrees to permit the Client's officers, authorized employees and agents to examine, inspect and have access to the books, records, papers, meters, equipment and facilities at all reasonable and proper times, with respect to the operation of the food services, in order to assure that each of the provisions of this Contract is being performed in a manner satisfactory to the Client.

ARAMARK will maintain separate bookkeeping records by unit for all their operations located on the Client's campus. At the close of each calendar month, ARAMARK shall render a Profit and Loss Statement for the month and year to date operations. ARAMARK shall provide Client an annual certified statement from an independent public accounting firm for their consolidated operations.

17. CONFIDENTIAL INFORMATION AND PROPRIETARY MATERIALS:

A. **Confidential Information:** All financial, statistical, operating and personnel materials and information, including, but not limited to, technical manuals, recipes, menus and meal plans, policy and procedure manuals and computer software programs, including those software programs created by Client based on ARAMARK supplied information, relative to or utilized in ARAMARK's business or the business of any subsidiary or affiliate of ARAMARK, shall be the property of ARAMARK and shall be confidential unless disclosure is required by law, including the Tennessee Public Records Law, T.C.A. §10-7-503. Client shall keep such information confidential to the extent and shall so instruct its agents, employees, and independent contractors, and the use of such information by Client in any manner shall not affect ARAMARK's ownership or the confidential nature of such information. Client shall not photocopy or otherwise duplicate

any such materials without the prior written consent of ARAMARK unless otherwise required by law.

B. **Proprietary Materials:** Client agrees that all computer software programs, signage and marketing and promotional literature and material (collectively referred to as "Proprietary Materials"), used by ARAMARK on Client's campus in connection with the food services provided by ARAMARK under this Agreement, shall remain the property of ARAMARK. Upon termination of this Agreement, all use of trademarks, service marks, and logos owned by ARAMARK or licensed to ARAMARK by third parties shall be discontinued by Client, and Client shall immediately return to ARAMARK all Proprietary Materials.

**18. NOTICE:** Notices required to be provided under this Agreement shall be in writing and shall be deemed to have been duly given if mailed first class as follows:

To ARAMARK:

ARAMARK Educational Services, Inc.
ARAMARK Tower
1101 Market Street
Philadelphia, PA 19107
**ATTN:** President

To Client:

The University of Tennessee
Suite 523 Andy Holt Tower
Knoxville, Tennessee 37996-3061
**ATTN:** Philip A. Scheurer
Vice Chancellor for Administration and Student Affairs

**19. ENTIRE AGREEMENT AND AMENDMENTS:** This Agreement represents the entire agreement between the parties and supersedes any and all prior agreements. All prior negotiations have been merged into this Agreement, and there are no understandings, representations, or Agreements, oral or written, express or implied other than those set forth herein. Obligations of the parties set forth in this Agreement arising out

of events occurring during the life of this Agreement shall survive the termination of this Agreement.

The terms of this Agreement may not be changed, modified or amended except by a writing signed by both parties.

**20. PERFORMANCE BOND:** The Client will require a Performance Bond in the sum of $1,500,000 prior to commencing operations. The performance bond will cover the life of the contract and must be issued by a bonding company authorized to do business in the State of Tennessee. **This bond must be delivered to Client's Purchasing Department fifteen (15) days prior to commencing operations.** Failure to maintain the required Performance Bond in force may be cause for contract termination.

**21. WAIVER:** The failure of ARAMARK or Client to exercise any right or remedy available under this Agreement upon the other party's breach of the terms, representations, covenants or conditions of this Agreement or the failure to demand the prompt performance of any obligation under this Agreement shall not be deemed a waiver of (i) such right or remedy; (ii) the requirement of punctual performance; or (iii) any right or remedy in connection with subsequent breach or default on the part of the other party.

**22. TERMINATION:** If at any time during the term of this Agreement, either party violates the terms of this Agreement, the non-breaching party reserves the right to serve written notice of the nature of such violation and that such non-breaching party is considering terminating the Agreement. Unless the breaching party correct, or makes arrangements to correct the violation to the satisfaction of the non-breaching party within ten (10) days of notification, this Agreement may be terminated after the corrections are not accomplished at the sole discretion of the non-breaching party ninety (90) days after the aforesaid written notice to the breaching party.

ARAMARK may terminate this Agreement as of the end of any contract year (July 1 - June 30) by giving Client at least 180 days' written notice prior to the end of the then current contract year. Client may terminate this Agreement as of the end of any

contract year (July 1 - June 30) by giving ARAMARK at least 90 days' written notice prior to the end of the then current contract year.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be signed by their duly authorized representatives the day and year first above written.

**THE UNIVERSITY OF TENNESSEE** ("Client")

By: ________________________
Title:

**ARAMARK EDUCATIONAL SERVICES, INC.**
("ARAMARK")

By: ________________________
Title: Regional Vice President

THE UNIVERSITY OF TENNESSEE
KNOXVILLE

Exhibit #2

Vice Chancellor for Administration and Student Affairs
Suite 523 Andy Holt Tower
Knoxville, Tennessee 37996-0155
(423) 974-3061
Fax (423) 974-3536

June 6, 1997

Mr. Richard Bissinger
Executive Vice President
Aramark Corporation
Building C, Suite 500
5775 Peachtree Dunwoody Road
Atlanta, Georgia 03042

VIA FAX
LETTER TO FOLLOW

Dear Dick:

Just a note to inform you that I have decided to appoint Ms. Jamie Miller, Acting Director of Food Services at UT Knoxville, as Contract Administrator effective July 1, 1997. Thought that you might want to have the "official word."

Sincerely,

Philip A. Scheurer
Vice Chancellor

scw

c: Ms. Jamie Miller

THE UNIVERSITY OF TENNESSEE
KNOXVILLE

Offices of VolCard, Campus Vending
& Contract Administration
472 S. Neyland Stadium
Knoxville, TN 37996-0730
Phone (423) 974-3430
Fax (423) 974-1403

January 25, 1999

Jeffrey M. Maples
Asst. Vice Chancellor
Student Affairs & Administration
501 Andy Holt Tower
University of Tennessee
Knoxville, TN 37996

Dear Jeff;

Please be advised that I would like to take my remaining weeks of approved Family Medical Leave between March 1 and April 29, 1999. I plan to also take the already approved annual leave scheduled for February 12 - 28, 1999. If this leave is approved as requested, I then plan to retire from the University of Tennessee April 30, 1999 with more than 32 years of service.

I would like to continue working my present schedule of 3 days per week through February 10, 1999, if possible.

If I have miscalculated the number of days of Family Medical Leave remaining, please advise. If this is acceptable to you, please let me know so I can proceed with retirement processing.

Thank you for your consideration.

Sincerely,

Jamesena M. Miller

file

JMM/lgp

cc. ✓Dr. Alan Chesney
Dr. Connie Baskette

EXHIBIT
3